Modjeska M. SIMKINS, F. B. Drakeford, Billie S. Flemming, Freddie Jolley, Isaac W. Williams, Dorothy Drakeford, Lenny Springs, Frank Gilbert, S. T. Peden, Hyland Davis, and Marva Smalls, Individually and on behalf of all others similarly situated, Plaintiffs,

v.

L. Marion GRESSETTE, Individually, in his official capacity as President Pro Tempore of the Senate of South Carolina, and as a representative of the class of members of the Senate of South Carolina, Richard W. Riley, Individually and in his capacity as Governor of South Carolina, Fredinan Stevenson, Individually and in her capacity as President of the South Carolina Senate, Rex L. Carter, Individually and in his official capacity as Speaker of the South Carolina House of Representatives, and as a representative of the class of members of the South Carolina House of Representatives, H. Ray Ham, Margaret Townsend, Zilla Hinton, James O. Brown, and Neal D. Thigpen, Individually and in their capacities as members of the South Carolina State Election Commission, Daniel I. Ross, Jr., Chairman of the South Carolina Republican Party, and Donald L. Fowler, Chairman of the South Carolina Democratic Party, Individually and as representatives of the class of officers of duly certified political parties of South Carolina, Defendants.

No. 80–1370.

United States Court of Appeals, Fourth Circuit.

Argued June 5, 1980.

Decided Sept. 22, 1980.

Mordecai C. Johnson, Florence, S.C., Fred Henderson Moore, Charleston, S.C. (Edward Brown, Charleston, S.C., John R. Harper, II, Columbia, S.C., W. Newton Pough, Orangeberg, S.C., on brief), for appellants.

Robert Guild, Columbia, S.C. (Warren & Pitts, Allendale, S.C., on brief), for Tom Turnipseed, etc.

Randall T. Bell, Columbia, S.C. (Daniel R. McLeod, Atty. Gen., Treva G. Ashworth, Senior Asst. Atty. Gen., Bernard Manning, Elliott D. Thompson, Columbia, S.C., on brief), for appellees.

Before WIDENER and ERVIN, Circuit Judges.*

WIDENER, Circuit Judge:

 Appellants are eleven black citizens and registered voters of the State of South Carolina.[1] They filed this action

---

* Decided by a quorum of the panel. 28 U.S.C. § 46(d).

1. State Senator Tom Turnipseed has moved to intervene as a defendant‑cross–claimant–ap-

against various South Carolina officials and against the chairmen of the State Democratic and Republican parties, alleging that South Carolina's present senate reapportionment plan dilutes their vote in violation of the First, Thirteenth, Fourteenth, and Fifteenth amendments to the United States Constitution and 42 U.S.C. §§ 1971, 1973 and 1983. They sought to have a three-judge district court convened pursuant to 28 U.S.C. § 2284,[2] to have the reapportionment plan declared unconstitutional, and to enjoin its enforcement.

1980 is an election year for the South Carolina State Senate. Plaintiffs filed their complaint March 14, 1980, two days before the opening of the filing period set by statute[3] for candidates seeking nomination through the State primaries. They sought a temporary restraining order to enjoin the opening of the filing period until a three-judge district court could be convened. The district court denied such motion. The defendants filed a motion under FRCP 12(b) to dismiss for failure to state a claim upon which relief could be granted. After an expedited hearing, the district court, 495 F.Supp. 1075, denied plaintiffs' request for the convening of a three-judge court and dismissed their complaint. They appeal from that order.

The senate reapportionment plan under attack here was adopted by the South Carolina legislature in 1972 following the decision in *McCollum v. West*,[4] which struck down as unconstitutional the South Carolina Senate reapportionment plan drawn up after the 1970 census as being in violation of the one man, one vote requirement of the Fourteenth Amendment as set out in *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). It had also been challenged as unconstitutionally diluting the black vote through its multi-member districts, numbered seats and majority runoff requirements. As a result of the *McCollum* decision, the State legislature provided more than one plan for judicial consideration. Plan A, submitted by the legislature, was subsequently approved by the *McCollum* court and ordered used for the conducting of the South Carolina Senate elections until revised by the State's General Assembly, or until the next census, or until further order of that court. The *McCollum* plaintiffs sought to vacate that order, alleging among other things, that the court did not consider the effect of the plan on racial minorities. The court denied their motion and stated at page 2 of its June 9, 1972 order that:

> Although the Court decided that Plan A complies with the guidelines of the Court's earlier order, the order of May 23 adopting Plan A expressly noted that elections should be held in conformity with Plan A until "further order of this Court."
>
> Any party seeking to challenge Plan A may, of course, bring an action seeking further relief. If such a party can prove Plan A constitutionally infirm based on facts not previously presented to this Court, relief would not be barred by the doctrine of *res judicata*.

Plan A, enacted as Act No. 1205,[5] is here

---

pellee. We allow him to intervene but treat him as a plaintiff-appellant since he seeks the same relief sought by the appellants. We reject as without merit his contention that the seniority system in the State Senate dilutes the votes of those who are represented by less senior senators.

**2.** 28 U.S.C. § 2284 provides in part:

(a) A district court of three judges shall be convened when otherwise required by Act of Congress, or when an action is filed challenging the constitutionality of the apportionment of congressional districts or the apportionment of any statewide legislative body.

**3.** S.C. Code § 7 13 40 provides in part that ". . . the entries for those wishing to offer for nomination in such party primary for State Senator . . . shall open at noon on March sixteenth and close at noon on March thirtieth . . . ."

**4.** No. 71 1211 (D.S.C. April 7, 1972). Although not formally consolidated with *Twiggs* or *McLeod*, *McCollum* was argued and decided with *Twiggs v. West*, No. 71 1106, and *McLeod v. West*, No. 71 1123.

**5.** Now codified as S.C. Code § 2-1 60.

challenged on the grounds that its provision for multi–member senatorial districts, with numbered seats and a majority runoff requirement in primary elections, impermissibly dilutes the black vote in South Carolina. In their complaint, plaintiffs allege that no black State Senators have been elected since the Reconstruction; that a consistent pattern of racial polarization exists in the State, making race the single most significant factor in an election; that multi–member districts have an adverse effect on the black vote because no black running since 1972 has gotten a political party nomination in a contested primary or been elected to the State Senate in a general election even though he received a majority of the black vote; that the numbered seat requirements further minimize the opportunity for blacks to elect the candidates of their choice; that South Carolina has a long history of racial discrimination in many facets of life; that the South Carolina legislature has ignored its affirmative duty to eliminate practices that dilute the black vote; that no interest greater than their Fifteenth Amendment rights are served by the present plan; that 30% of the population of South Carolina is black; that the purpose and effect of the plan is to dilute the black vote; that the use of county boundaries, numbered seats and majority runoffs further dilute the black vote; that the political parties in South Carolina have relied upon tactics designed to dilute the black vote; that blacks have suffered as a result of this plan; that blacks have less opportunity than whites to participate in the political process and elect representatives of their choice; and that the present plan was enacted with the purpose and effect of racial discrimination.

The district court denied appellants' request for a three–judge court and dismissed their complaint, relying primarily on *Maryland Citizens for a Representative General Assembly v. Governor of Maryland,* 429 F.2d 606 (4th Cir. 1970). In that case we established the guidelines to be used by a single judge in determining whether to convene a three–judge court. Section 2284(b)(1) requires convening of a three–judge district court when a suit is filed that challenges the constitutionality of the apportionment of a congressional district or any statewide legislative body unless the single judge "determines that three judges are not required." In *Maryland Citizens* we stated at 611 that:

> If it appears to the single district judge that the complaint does not state a substantial claim for injunctive relief, he need not request the convening of a three–judge court. Insubstantiality in the claim may appear because of the absence of federal jurisdiction, lack of substantive merit in the constitutional claim, or because injunctive relief is otherwise unavailable.

Based on such language, the district court found that injunctive relief would not be available to the plaintiffs primarily because of their delay in filing this action and because of the impending 1980 census that would likely require reapportionment. Holding that general equitable principles would prevent a three–judge court from granting relief, the district court determined that it would be inappropriate to convene such a court. The district court then went further to determine whether plaintiffs' factual allegations were so compelling that equity should be disregarded and a three–judge court convened. Based upon *City of Mobile v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), and the prior decision in *McCollum,* the court found no reason to require the convening of a three–judge court.

Plaintiffs claim that *Maryland Citizens* is no longer good law in light of *Goosby v. Osser,* 409 U.S. 512, 93 S.Ct. 854, 35 L.Ed.2d 36 (1973), and therefore the district court erred in its reliance on it. We find, however, that the plaintiffs have not stated a substantial claim, and that the district court did not commit reversible error in denying their request for the convening of a three–judge court. As an alternate ground for our decision, we find that the district court correctly applied *Maryland Citizens* in its denial of relief to the plaintiffs.

Briefly, Act No. 1205 provides for the reapportionment of South Carolina's forty–six counties into sixteen senatorial districts ·for election of the State's forty–six senators.[6] Three are single member districts and the remainder are multi–member districts containing two to five senators from each of those districts. Each seat is separately numbered, with candidates eligible to run for only one seat. South Carolina Code § 7–17–600 provides that a majority of the votes cast are necessary for nomination in a primary election. Plaintiffs challenge all facets of this plan.

The *McCollum* court had struck down the predecessor of Act No. 1205. That earlier plan provided for multi–member districts with numbered seats. Section 7–17–600's majority runoff requirement for primaries was then also in effect. Code of South Carolina, 1962, § 23–496. That court, however, did not strike the plan down on the grounds now argued but instead because of its population variances and its residency requirements. The *McCollum* court did consider and reject the contentions attacking the multi–member districts with numbered seats and majority runoffs. Because of the importance of that case to our decision today, we quote a portion of the court's opinion as follows:

> We do not agree, however, that any plan that may be formulated by the General Assembly must provide for single-member districts, and cannot include multi–member districts. Were this required, it is manifest neither the General Assembly nor the Court would likely be able to work out a proper plan of reapportionment for use at the election in November. We do not, however, find such drastic action required. The ·authorities do not interdict multi–member districts. So much was held in both *Fortson v. Dorsey* [379 U.S. 433, 85 S.Ct. 498, 13 L.Ed.2d 401], supra, and *Burns v. Richardson* [384 U.S. 73, 86 S.Ct. 1286, 16 L.Ed.2d 376],

supra. It was reaffirmed and emphasized anew in *Whitcomb v. Chavis* (1971) 403 U.S. 124, 147 [91 S.Ct. 1858, 1871, 29 L.Ed.2d 363], where in sustaining multi–member districts, the Court said that, "We are not ready, however, to agree that multi–member districts, wherever they exist, over–represent their voters as compared with voters in single–member districts, even if the multi–member delegation tends to bloc voting." It is only when the provision for multi–member districts incorporates some additional provision that unconstitutionally "operate(s) to minimize or cancel out the voting strength of racial or political elements" that it becomes illegal. Such dilution is not to be presumed; it must appear on the face of the legislation itself or from the evidence in the record. The Supreme Court found no such effect in the Indiana ·multi–member plan reviewed in *Chavis* ; indeed, as the Court remarked in *Chavis*, it has never sustained an attack on a multi–member plan. If the General Assembly in this case adopts a plan with acceptable population variances and without any special provisions diluting "the voting strength of racial or political elements" the plan is not to be invalidated merely because it contains both single–member and multi–member districts. The plaintiff McCollum suggests, though, that, because of a record of past racial discrimination, *Chavis*, with its approval of multi–member districts, is not applicable to a .legislative reapportionment effected by a Southern Legislature. However, there is not the slightest evidence that in its reapportionments, South Carolina has ever been motivated by racial considerations. In fact, we understood that counsel for McCollum conceded the want of racial motivation in the reapportionment plans reviewed in this action. Under these circumstances, there is no basis for regarding the situation in South

---

6. South Carolina since 1868 had modeled its General Assembly apportionment on "the federal analogy" and provided for one senator per county. S.C. Constitution Art. III § 6. That type of apportionment was struck down in

*Reynolds v. Sims*, 377 U.S. 533, 571–576, 84 S.Ct. 1362, 1386–1389, 12 L.Ed.2d 506 (1964), and its companion case, *Lucas v. General Assembly of Colorado*, 377 U.S. 713, 84 S.Ct. 1459, 12 L.Ed.2d 632 (1964).

Carolina differently from that in Indiana, which was at issue in *Chavis*. It is not to be lightly assumed that the Supreme Court intends to establish "different apportionment rules for the North and the South," and yet that is what the argument of plaintiff McCollum leads to.

Neither do we find the provisions for a "numbered place system of conducting primary and general elections, included in both plans, illegal. Under this system, each senate seat constitutes a separate and distinct office, and candidates, in qualifying, must file for one specific senate seat in any district where more than one senator is to be nominated. It is contended by the plaintiffs that this "numbered seat law" illegally dilutes minority voting power. If a plan does not incorporate the invalid residency provision, or some similar invalid restriction, it does not appear that the "numbered seat" requirement is either arbitrary or unreasonable, especially if applied fairly and indiscriminately to all senatorial seats.

. . .

April 7, 1972 order in *McCollum* at pages 17–19. Footnotes omitted.

As previously stated, *McCollum* allowed parties seeking to challenge Plan A, now Act No. 1205, to bring an action based upon new facts not then before the court. It becomes necessary then to consider plaintiffs' contentions in view of the contentions raised in the previous *McCollum* decision.

Plaintiffs claim that there is a pattern of racial polarization in South Carolina that makes race the single most significant factor in any election. Because of this polarization, it is argued the establishment and use of multi–member senatorial districts has the effect of diluting the black vote.

This, they say, is shown by the fact that no blacks have been elected to the South Carolina Senate in this century. Plaintiffs see No. 1205 as a method by which South Carolina is attempting to perpetuate racial discrimination in South Carolina.

This argument, however, was presented and rejected by the *McCollum* court.[7] There, McCollum argued in his brief to the district court that "racial discrimination is deeply rooted in virtually every phase of life in South Carolina;" that "no black person in this century has been elected to the South Carolina Senate, nor to the House of Representatives except in 1970. There is proof that, even in the 1970 election, black votes were diluted and, in some instances, outweighed by votes cas[t] along racial rather than political lines [footnote omitted]." Further, McCollum argued that "race is still an important issue in South Carolina and that because of it, blacks are frozen into permanent minorities destined for regular defeat at the hands of relatively monolithic majorities."

Here, plaintiffs contend that the numbered seat requirement, majority runoffs and retention of county boundaries enhance the dilution of their vote. These claims were likewise made in *McCollum*.[8] Additionally, plaintiffs allege that "Act No. 1205 and its related predecessor plans, were enacted with the purpose and effect of discrimination on account of race." That claim was specifically rejected by the *McCollum* court, with that court finding "there is not the slightest evidence" of racial motivation.

The substantiality of these claims was adjudicated adversely to plaintiffs' claims by the *McCollum* court. That decision found them to be without merit. Although

---

**7.** In his complaint, McCollum alleged that: "The creation of multi–member senatorial districts, however, with senators elected at large, operates to dilute and cancel out the voting strength of plaintiffs and their class."

**8.** In his complaint, McCollum alleged that: "The above mentioned diluting effect is aggravated by . . . the use of the 'numbered post' system. . . ." In his brief, he argued that "[t]he South Carolina system isolates minorities in another significant way . . . the majority requirement (and runoff) and numbered place system of conducting primary elections." In disputing the State's defense of using county boundaries, he stated that "[i]n most respects, to say that county lines should form the basis of legislative district lines because counties are the subdivisions of the State is simply a non-sequitur."

technically *McCollum* may not be *res judicata*, nor may these plaintiffs be estopped by its judgment, we find very persuasive the decision in *McCollum*,[9] for the defendants have had the identical issues [10] presented here decided in their favor in *McCollum*. Thus, that decision is more persuasive than it might otherwise be. We therefore conclude that these claims as they relate to a time prior to the *McCollum* decision are insubstantial within the meaning of *Goosby*.

Because voting rights are at issue here, in an abundance of caution, at oral argument we inquired of plaintiffs what facts they would show if given an opportunity. The reply was that they would show that no blacks have been elected since the *McCollum* decision and prior to that in this century. They say they wish to prove racial polarization in voting and that black candidates do not have access to the financial resources to run in multi–member districts.

■ We think the claim of lack of access to financial resources could have nothing to do with race and is an impermissible consideration.

At this point we should note that from 1868 until 1965 the South Carolina Senate was elected under a system which provided for one senator from one county in single–member districts. As result of *O'Shields v. McNair*, 254 F.Supp. 708 (D.S.C.1966) (three–judge court), in December 1965 the South Carolina system of electing its senate was held to be invalid. Early in 1966, the legislature divided the State into 27 election districts from which 50 senators were to be chosen. From that time on the senate has been elected in large part from multi–member districts, the number having been reduced to 46, as it originally was, by the case of *State v. West*, 249 S.C. 243, 153 S.E.2d 892 (1967). So the history of multi–member senate districts in South Carolina goes back only as far as 1966, for before that time, during all periods relevant here, there was one senator from each of the State's 46 counties in single–member districts. Thus, whatever force the allegation may have that no black candidate has been elected to the senate in this century loses much of its weight when it is remembered that for the greater part of that time the present system of electing senators was not in effect and they were in fact elected from single–member one–county districts.

■ We now turn to the examination of the pivotal and only fact in the plaintiffs' case not disposed of in *McCollum*—that no black senators have been elected since 1972. This fact alone, even added to the *McCollum* facts, is not sufficient to state a claim here. In *City of Mobile, Alabama v. Bolden,* 446 U.S. 55, 66, 100 S.Ct. 1490, 1499, 64 L.Ed.2d 47 (1980), a plurality of the Supreme Court stated:

> Despite repeated constitutional attacks upon multi–member legislative districts, the Court has consistently held that they are not unconstitutional *per se*. We have recognized, however, that such legislative apportionments could violate the Fourteenth Amendment if their purpose were invidiously to minimize or cancel out the voting potential of racial or ethnic minorities. To prove such a purpose it is not enough to show that the group allegedly discriminated against has not elected representatives in proportion to its numbers. [Footnotes and citations omitted]

---

**9.** Plaintiffs here were not parties to the *McCollum* suit. The parties had argued the preclusory effect of *McCollum* without mentioning whether or not it was a class action. We had thus assumed that that case was decided as a class action. Although McCollum brought his suit on behalf of a class, a post–argument close examination of the *McCollum* record indicates the case was never certified as a class action. While it may be argued that the judgment in favor of the defendants in *McCollum* operates as issue preclusion here, we do not depend on that technical ground for our decision. We have emphasized the *McCollum* case, however, and do place substantial reliance upon it in arriving at our decision, for the defendants or their predecessors in interest have have to defend against the same claims twice, and in neither case have the plaintiffs offered to prove any facts other than those we have mentioned in our opinion.

**10.** Plaintiffs candidly conceded in their argument in the district court that "the allegations of the complaint in this action, in large measure, reincorporate the allegations in the *West* and *McCollum* and *Twiggs* case. . . ."

Further, the Court noted that "[i]t may be that Negro candidates have been defeated but that fact alone does not work a constitutional deprivation." Id. at 73, 100 S.Ct. at 1503. Justice Stevens, concurring in the result, likewise noted that there exists no constitutional right for proportional representation for racial minorities. Id. at 86, 100 S.Ct. at 1510. So, a majority of the Court has held there is no proportional representation for minorities.

In Bolden, the Court reversed a decision of the court of appeals which had affirmed a district court decision that Mobile's at–large system of electing members of the City Commission violated the Fourteenth and Fifteenth Amendments because it diluted the voting strength of black voters. Mobile's City Commission was elected in an at–large election for numbered seats with a majority runoff requirement. Thus, it contained all the elements of the statutory scheme objected to by the plaintiffs here. The plurality opinion of the Court specifically rejected the district court's reliance upon past official discrimination in Alabama as evidence of unconstitutional dilution of the black vote.[11] Although the Court was divided on the quantum of proof necessary, and whether or not intent is required to prove a case, that discriminatory

effect no longer is sufficient to state a claim was clearly held by the majority.

A majority in Bolden also rejected the theory of voting dilution expressed in Zimmer v. McKeithen, 485 F.2d 1297 (5th Cir. 1973), aff'd on other grounds sub nom. East Caroll Parish School Bd. v. Marshall, 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976),[12] which represents the real allegation made by plaintiffs here. In that case, the court found unconstitutional voting dilution where the plaintiff had shown that there were (1) very few blacks in history elected to public office; (2) a history of past racial discrimination in all facets of life; (3) past voting discrimination; (4) multi–member districts; and (5) a majority vote requirement. After Bolden it seems clear that those allegations are not enough to make a claim of purposeful discrimination.

■ In Whitcomb v. Chavis, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971), followed by the McCollum court and by the plurality in Bolden, the Court rejected arguments that the votes of ghetto residents, who were primarily black, were diluted. In that case, the Court examined the results of five elections and concluded that those results did not establish discrimination.[13] It stated at p. 149, 91 S.Ct. at 1872:

11. The plurality stated that "past discrimination cannot . . . condemn governmental action that is not itself unlawful. The ultimate question remains whether a discriminatory intent has been proved in a given case. More distant instances of official discrimination in other cases are of limited help in resolving that question." 446 U.S. at 74, 100 S.Ct. at 1503–1504.

Mr. Justice Stevens, in concurring, did not agree with the plurality's theory that the subjective intent of the decision makers is a key to a finding of invalidity and indicated that he would even accept as a fact that there may have been some discrimination as a part of the setting up of the system of electing the Commission, for he observed that "drawing political boundaries is generally committed to the legislative process and that the process inevitably involves a series of compromises among different group interests." 446 U.S. at 91, 100 S.Ct. at 1513. His test for liability would seem to turn on whether there is otherwise any legitimate justification for the estab-

lished system which he felt was present in that case.

It follows, since the plurality rejected the theory of past discrimination and the failure to elect minority officials as facts which would support a finding of invalidity, that, taken together with Mr. Justice Stevens' concurrence, a majority of the Court has rejected a claim of invalidity when considering a plan containing each aspect of the South Carolina plan for electing State senators; that is to say, a multi–member election district which conducts at–large elections for numbered seats with majority runoff requirement and which has not elected minority officials.

12. The plurality opinion of the Court rejects Zimmer's theory at 446 US. 69–74, 100 S.Ct. 1501 ·1504. Mr. Justice Stevens also rejects Zimmer at 88, 100 S.Ct. at 1511.

13. We are asked here to examine the results of at the most four elections and make a determination of purposeful discrimination from the results thereof. We decline to do so.

Nor does the fact that the number of ghetto residents who were legislators was not in proportion to ghetto population satisfactorily prove invidious discrimination absent evidence and findings that ghetto residents had less opportunity than did other Marion County residents to participate in the political processes and to elect legislators of their choice. We have discovered nothing in the record or in the court's findings indicating that poor Negroes were not allowed to register or vote, to choose the political party they desired to support, to participate in its affairs or to be equally represented on those occasions when legislative candidates were chosen. Nor did the evidence purport to show or the court find that inhabitants of the ghetto were regularly excluded from the slates of both major parties, thus denying them a chance of occupying legislative seats.

▆ In light of *McCollum, Bolden* and *Whitcomb*, the plaintiffs have not alleged sufficient facts to raise a substantial claim requiring the convening of a three–judge court.[14] Bare conclusions of unconstitutionality are not enough. The fact that no blacks have been elected since 1972, alone, or added to the *McCollum* case, is not enough to support a claim for relief. Even if the plaintiffs were able to prove all the additional allegations they have made thus far, their constitutional attack would be unsuccessful in the light of *Bolden* and *Whitcomb*. Thus, considering the allegations in the complaint now before us, including those few not presented to the *McCollum* court, no substantial claim is presented because *Bolden* and *Whitcomb* inescapably render the claim frivolous. *Goosby*, p. 518, 93 S.Ct. p. 858. *Bolden*, especially, is on facts indistinguishable from those presented here.

▆ The alternate ground for affirming the judgment of the district court is the ground upon which that court primarily relied–that plaintiffs' delay in filing suit foreclosed the grant of any equitable relief under *Maryland Citizens*. That case upheld the district court's refusal to convene a three–judge district court and dismissal of a complaint where suit challenging the apportionment plan for the Maryland General Assembly was filed thirteen weeks prior to the filing deadline for candidates seeking election to the General Assembly of Maryland in 1970. The maintenance of such a suit at that time, the court concluded, would have resulted in great disruption in the election process in Maryland, with such disruption being forced upon a State legislature which had not been recalcitrant in taking action in the past to reapportion when necessary. Further, the court noted that any reapportionment arising out of such a suit would have only affected one election because a federal census was conducted in 1970, the results of which would have required another statewide reapportionment. On those facts, we held that equitable grounds prevented the granting of relief regardless of the merits of the plaintiffs' claims. Insubstantiality of a claim, as we have noted, can be based upon the absence of federal jurisdiction, lack of substantive merit on the constitutional claim, or because injunctive relief is otherwise not available. It is the latter ground upon which the court relied in *Maryland Citizens*.

▆ The facts here present an even stronger basis for applying the doctrine than did *Maryland Citizens*. Plaintiffs in our case waited until two days before the opening of the filing period to bring suit, and sixteen days before the deadline, see S.C.Code § 7–13–40, while the *Maryland Citizens'* complaint was filed thirteen weeks before the filing deadline. Although the court below expedited this matter as best possible, the hearing did not occur until the filing deadline had passed and only 5½ weeks remained before the primary elec-

14. We emphasize there has been no serious contention in this case, or offer of any proof, that black citizens are not permitted complete participation in the entire political process. The complaint is that black candidates have not been elected, and from that follows the plaintiffs' argument that black citizens are unable fully to participate in political affairs. We are of opinion the argument is without merit.

tions themselves. The hearing was held on May 1st, and the primary election was held on June 10th as set out in S.C.Code § 7–13–40.

The last election for State senators in South Carolina occurred in November 1976. The results of that election, upon which plaintiffs so heavily rely here, were known to them at that time. Instead of bringing suit then, they chose to wait for more than three years until the eve of the 1980 elections. The record reflects no good reason for the delay. Such a delayed suit, if maintained, would clearly cause a major disruption in the election momentarily to begin in South Carolina. This disruption, coupled with the fact that 1980 is also the year of a national census which will likely require reapportionment in South Carolina, places this case squarely within our holding in *Maryland Citizens.*

Plaintiffs argue that the holding in *Goosby* casts some doubt on the vitality of the *Maryland Citizens'* holding. We disagree. The court below correctly noted that *Goosby* dealt with the substantiality of the claim on its merits and not the inappropriateness of equitable relief. The *Goosby* court was dealing with the second basis of insubstantiality set out in *Maryland Citizens,* that is the lack of substantive merit of the constitutional claim itself, while in our alternate ground for decision, we need not consider the merits of the claim since equitable relief is unavailable in any event.

Since *Goosby* was decided, this court has relied upon *Maryland Citizens* in denying a request for a three–judge district court solely on equitable grounds. *Age of Majority Educational Corp. v. Preller,* 512 F.2d 1241 (4th Cir., 1974) (en banc). Thus, *Maryland Citizens'* continuing vitality has been sustained by an en banc decision of this court.[15] Clearly, the teachings of *Maryland Citizens* are directly applicable here and as such provide an additional ground for affirmance of the district court's judgment.

The judgment of the district court is accordingly

*AFFIRMED.*[16]

---

**15.** Plaintiffs argue in their brief that the approval of *Maryland Citizens* in *Age of Majority* is not dispositive here absent a showing that *Goosby* was called to the attention of the en banc court. Expressing no opinion on the abstract merit of such an argument, we have reviewed the briefs in *Age of Majority* which reveal that *Goosby* was in fact argued to that en banc court.

**16.** Two further matters deserve mention.

First. Following oral argument in this case, we inquired by telephone of the South Carolina Division of Research and Statistical Services as to the county by county makeup of the population of that State, both currently and for 1970, fancying the same to be public information. That Division replied by way of letter dated June 7, 1980, sending a copy of its reply to the defendants' attorneys but not to plaintiffs'. We forthwith sent a copy of the reply from the

Division to the plaintiffs' attorneys on June 16, 1980. The plaintiffs' attorneys have objected to the consideration by the court of the information received from the Division concerning South Carolina's population. It has not been necessary for us to consider the population makeup of South Carolina any more than is shown in the record before us, and because we have not considered the information in arriving at our decision, we find it unnecessary to pass upon the objection.

Second. Only moments before oral argument, plaintiffs filed a motion that Honorable Donald Russell recuse himself from the hearing of this case. Judge Russell did not recuse himself but declined to sit. This case was heard and decided by a quorum of the panel which was authorized to hear the case. 28 U.S.C. § 46(d).