Charles WHITE; George R. Smith and James A. Smith, Jr., Plaintiffs–Appellees,

v.

Raymond S. DANIEL; Thomas B. Taylor; Walter Rice; Marion W. Peebles and Paul Harrison, in their official capacities as members of the Board of Supervisors of Brunswick County, Virginia; Mathew B. Morton; C.M. Caldwell and Jesse E. Capps, Sr., in their official capacities as members of the Electoral Board of Brunswick County, Virginia and Barbara Lewis, in her official capacity as Registrar of Brunswick County, Virginia, Defendants–Appellants.

No. 89–1550.

United States Court of Appeals, Fourth Circuit.

Argued May 8, 1990.

Decided July 23, 1990.

As Amended Aug. 16, 1990.

Rehearing and Rehearing In Banc Denied Aug. 14, 1990.

Anne Gordon Greever, argued (Joseph D. McCluskey, on brief), Hunton & Williams, Richmond, Va., for defendants-appellants.

Gerald Thomas Zerkin, argued (Karen L. Ely–Pierce, Kelley H. Brandt, on brief), Gerald T. Zerkin & Associates, Richmond, Va., for plaintiffs-appellees.

Before SPROUSE, CHAPMAN, and WILKINS, Circuit Judges.

CHAPMAN, Circuit Judge:

Plaintiffs-appellees Charles White, James A. Smith, Jr., and George R. Smith, who are adult black citizens registered to vote in Brunswick County, Virginia, and the Brunswick County Chapter of the National Association for the Advancement of Colored People (NAACP) brought this action against defendants-appellants, members of the Brunswick County Board of Supervisors (the Board) (Raymond S. Daniel, Thomas B. Taylor, Walter Rice, Marion W. Peebles, and Paul Harrison), members of the Electoral Board of Brunswick County (Mathew B. Morton, C.M. Caldwell, and Jesse E. Capps, Jr.), and the Registrar of Brunswick County (Barbara Lewis). The plaintiffs allege that the method of election of the members of the Board results in the abridgement of their right to vote in violation of Section 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973 (Supp.1989) (the Act), and dilutes, minimizes or cancels the voting strength of blacks in violation of the First, Thirteenth, Fourteenth and Fifteenth Amendments to the United States Constitution. After dismissing plaintiffs' constitutional claims, the district court held that the current electoral system for the Board violated Section 2 of the Act and ordered the redistricting of Brunswick County not later than December 31, 1990. While we recognize and respect the seriousness of plaintiffs' allegations, we find the district court erred in failing to apply the equitable doctrine of laches to bar plaintiffs' present claims, and we reverse.

I

Brunswick County is a primarily rural county in southside Virginia that, according to the 1980 census, is 57.4% black. It is governed by a five-member Board of Supervisors elected every four years from five single member districts. The original districts, which were coextensive with the five magisterial districts (Meherrin, Powellton, Red Oak, Sturgeon, and the town of

Lawrenceville), were redistricted in 1971 to comply with the constitutional requirement of proportional representation. This created the present five numbered districts of which Districts Two and Four had black populations greater than 65%, and Districts Three and Five had black populations greater than 50%. Before the redistricting, only one magisterial district had a black majority over 65%. The County was not redistricted following the 1980 census, which reflected the black population of each district as follows: District One: 50.7%; District Two: 64.8%; District Three: 55%; District Four: 68.2%; and District Five: 48.9%. No one challenged the 1971 redistricting nor the 1981 decision not to redistrict following the 1980 census.

The plaintiffs initiated this action by filing their complaint in September 1988, seventeen years after the 1971 redistricting, and claim that the method of election of the Board violated Section 2. The plaintiffs contended that there was a long history of discrimination against blacks in Brunswick County and that only Districts Two and Four have elected black representatives to the Board since 1975, and the remaining districts have elected no blacks. As a result, the Board has never had a black majority, although the County has a black majority. In its answer, the County asserted in part that plaintiffs' claims for relief are barred by the doctrine of laches.

At the close of plaintiffs' case, the court dismissed their constitutional claim, finding that there was no evidence of intentional discrimination in the formation or implementation of the system. However, the court subsequently held that the County violated plaintiffs' statutory rights under Section 2 of the Voting Rights Act.[1] Applying the framework set forth in *Thornburg v. Gingles*, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986),[2] the district court found that the County's black population is sufficiently large and geographically compact to constitute an effective voting majority in three election districts and that the County's elections were characterized by racially polarized voting. The court relied heavily on the testimony of plaintiffs' expert witness, Dr. Allan J. Lichtman.[3] Consequently, the court concluded that "the current system for election to the

---

1. Section 2(a) of the Voting Rights Act of 1965 prohibits any "voting qualification or prerequisite to voting or standard, practice, or procedure ... which results in a denial or abridgement of the right of any citizen ... to vote on account of race or color...." Section 2(b) further states that the Act is violated where the "totality of circumstances" reveals that "the political processes leading to nomination or election ... are not equally open to participation by members of a [protected class] ... in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *See generally Thornburg v. Gingles*, 478 U.S. 30, 36, 106 S.Ct. 2752, 2759, 92 L.Ed.2d 25 (1986); *Collins v. City of Norfolk*, 816 F.2d 932, 935 (4th Cir.1987).

2. In *Gingles*, the Supreme Court set forth a three-part test, under which the plaintiffs must prove
    (1) that the minority group is "sufficiently large and geographically compact to constitute a majority in a single-member district;"
    (2) that the minority group is "politically cohesive;" and
    (3) that "the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances ...—usually to defeat the minority's preferred candidate."

*Gingles*, 478 U.S. at 50–51, 106 S.Ct. at 2766–67. The latter two elements are typically synthesized into a general inquiry whether there is racial bloc or racially polarized voting.

3. Dr. Lichtman offered several kinds of evidence. First were correlations of individual behavior to aggregate level data. In this analysis, he reviewed evidence of voting returns in every County election since 1971 where a black candidate ran against a white candidate and found that in almost all elections the black received an extremely low percentage of votes in white majority precincts and an extremely high percentage in black majority precincts. He also found that different black candidates in different elections received substantially the same vote in each precinct, which he said was "very unusual."

Second, he prepared a more sophisticated ecological regression analysis to estimate the percentage of blacks and whites who voted for the black and white candidates in any particular election. He found that 98% of the white voters voted for a white candidate, while 2% of the white voters voted for a black candidate; and about 83% of the black voters voted for a black candidate, while 17% voted for a white candidate.

Board of Supervisors has interacted with past and present official discrimination and social conditions to deprive the black population of an equal opportunity to participate in the political system and to elect representatives of their choice."

## II

We need not address the variety of claims made by the plaintiffs, because we feel that the application of the doctrine of laches is dispositive. Laches is one of the affirmative defenses generally allowable under Fed.R.Civ.P. 8(c), although it is properly relevant only where the claims presented may be characterized as equitable, rather than legal. *See Environmental Defense Fund, Inc. v. Alexander,* 614 F.2d 474, 478 (5th Cir.), *cert. denied,* 449 U.S. 919, 101 S.Ct. 316, 66 L.Ed.2d 146 (1980). Laches imposes on the defendant the ultimate burden of proving "(1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense." *Costello v. United States,* 365 U.S. 265, 282, 81 S.Ct. 534, 543, 5 L.Ed.2d 551 (1961). Needless to say, whether laches bars an action depends upon the particular circumstances of the case. *National Wildlife Federation v. Burford,* 835 F.2d 305, 318 (D.C.Cir.1987). As a result, the equitable balancing of a plaintiff's delay with prejudice to a defendant is primarily left to the sound discretion of the trial court, and we may not reverse " 'unless it is so clearly wrong as to amount to an abuse of discretion.' " *Lingenfelter v. Keystone Consol. Indus., Inc.,* 691 F.2d 339, 341 (7th Cir.1982) (quoting *Baker Mfg. Co. v. Whitewater Mfg. Co.,* 430 F.2d 1008, 1009 (7th Cir.1970), *cert. denied,* 401 U.S. 956, 91 S.Ct. 978, 28 L.Ed.2d 240 (1971)).

The first element of laches—lack of diligence—exists where "the plaintiff delayed inexcusably or unreasonably in filing suit." *National Wildlife Federation,* 835 F.2d at 318. *See also Giddens v. Isbrandtsen Co.,* 355 F.2d 125, 128 (4th Cir. 1966) (where "inexcusable or inadequately excused delay"); *Baylor University Medical Center v. Heckler,* 758 F.2d 1052, 1057

(5th Cir.1985) (where "delay is not excusable"). An inexcusable or unreasonable delay may occur only after the plaintiff discovers or with reasonable diligence could have discovered the facts giving rise to his cause of action. *See Ward v. Ackroyd,* 344 F.Supp. 1202, 1212 (D.Md.1972); *Knox v. Milwaukee County Bd. of Elections Comm'rs,* 581 F.Supp. 399, 402 (E.D.Wis. 1984). The defendant may show lack of diligence either by proof that the action was not commenced within the period provided by the applicable statute of limitations or by facts otherwise indicating a lack of vigilance. *Giddens,* 355 F.2d at 128.

The second element—prejudice to the defendant—is demonstrated by a disadvantage on the part of the defendant in asserting or establishing a claimed right or some other harm caused by detrimental reliance on the plaintiff's conduct. *Gull Airborne Instruments, Inc. v. Weinberger,* 694 F.2d 838, 844 (D.C.Cir.1982). However, the defendant "is aided by the inference of prejudice warranted by the plaintiff's delay. The plaintiff is then to be heard to excuse his apparent laggardness and to prove facts manifesting an absence of actual prejudice." *Giddens,* 355 F.2d at 128. Clearly the greater the delay, the less the prejudice required to show laches, and vice versa. But the defendant is ultimately required to prove prejudice (given the defendant's burden to plead and prove laches under Fed.R.Civ.P. 8(c)) and "may either rest on the inference alone or introduce additional evidence." *Id.*

We find that the plaintiffs' delay was inexcusable and unreasonable. The Board adopted the current districting plan in 1971, based on the 1970 census figures; after looking at the 1980 census results, the Board decided in 1981 to continue the 1971 plan with no changes whatsoever. However, the plaintiffs voiced no objection either to the 1971 redistricting or to the 1981 decision not to redistrict, and waited until September 1988 to file this action, seventeen years after the 1971 plan was

adopted and months after the last election under the 1981 plan took place.[4]

Plaintiffs contend that their delay was justified on the grounds that the additional time provided them with more elections for the utilization of ecological regression and other methods of determining the existence of racially polarized voting. In particular, plaintiffs point out that filing before November 1987 would have eliminated seven elections on which Dr. Lichtman relied. The plaintiffs ignore the election results from the 1970s and early 1980s that Dr. Lichtman used and do not explain how such results are inadequate to support their claims.[5] Indeed, the conclusions that Dr. Lichtman draws from his analysis do not hinge on elections held after 1987. Therefore, we find that the plaintiffs, in the exercise of reasonable diligence, could have discovered at a much earlier time the facts upon which they now base their claim. The analyses to support their allegations should have been conducted earlier and well before the last election to be held under the 1981 plan.

Given that plaintiffs' delay is inexcusable and unreasonable, the County need not show the degree of prejudice that would be required if the delay had been less aggravated. In determining the issue of what prejudice is legally cognizable, we note that no case is directly on point. It is clear, however, that a challenge to a reapportionment plan close to the time of a new census, which may require reapportionment, is not favored. In *Maryland Citizens for a Representative General Assembly v. Governor of Maryland*, 429 F.2d 606 (4th Cir.

1970), we found injunctive relief unavailable to plaintiffs who filed thirteen weeks prior to the filing deadline for primary elections to determine the nominees of the parties for the Maryland General Assembly. This court explained that allowing such an action "would necessarily impose great disruption upon potential candidates, the electorate and the elective process." Significantly, we emphasized that any judicially ordered reapportionment would be "good for the 1970 elections only," because the 1970 census would require reapportionment. *Maryland Citizens*, 429 F.2d at 610.

In *Simkins v. Gressette*, 631 F.2d 287 (4th Cir.1980), this court found injunctive relief foreclosed to plaintiffs who waited to bring suit until two days before the opening of the filing period for candidates seeking nomination for South Carolina state senator, and sixteen days before the final deadline for filing. Finding the case controlled by *Maryland Citizens*, we explained not only that the delayed suit "would clearly cause a major disruption in the election," but also that the year of the election was "the year of a national census which will likely require reapportionment in South Carolina." *Simkins*, 631 F.2d at 296. Although in *Maryland Citizens* and *Simkins* we emphasized that the untimely challenges were made just before a scheduled election, in each case we found significant the nearness to the next census and resulting reapportionment.[6]

In this case, plaintiffs did not file suit until September 1988, which was after the

---

**4.** No new elections will be held for Brunswick County county supervisors until November 1991.

**5.** We note that Dr. Lichtman's analysis used results from elections held in 1971 (two contests), 1972 (one), 1974 (one), 1975 (one), 1981 (one), 1982 (one), 1985 (one), 1987 (three), and 1988 (three).

**6.** Both *Maryland Citizens* and *Simkins* arose in the context of plaintiffs' demand for the convening of a three-judge court. This court stated the test for granting such a request as follows:

If it appears to the single district judge ... that the complaint does not state a substantial claim for injunctive relief, he need not re-

quest the convening of a three-judge court. Insubstantiality in the claim may appear because of the absence of federal jurisdiction, lack of substantial merit in the constitutional claim, *or because injunctive relief is otherwise unavailable.*

*Maryland Citizens*, 429 F.2d at 611 (footnotes omitted) (emphasis added). Since this court in both cases denied the request on the basis that injunctive relief was not available, and because the availability of injunctive relief depends on such equitable principles as laches, these cases are relevant to the applicability of the doctrine of laches here.

last election under the 1981 plan, and sixteen months before beginning the 1990 census, which may require reapportionment.[7] Why is this prejudicial to the County? First, "there is large potential for disruption in reapportioning with undue frequency." *Maryland Citizens*, 429 F.2d at 610 (citing *Reynolds v. Sims*, 377 U.S. 533, 583, 84 S.Ct. 1362, 1392, 12 L.Ed.2d 506 (1964) ("Limitations on the frequency of reapportionment are justified by the need for stability and continuity in the organization of the legislative system.")). If we affirm the district court's order, the Board will be required to reapportion itself this year and it will probably be required to do so again next year, when the results of the 1990 census are available. We believe that two reapportionments within a short period of two years would greatly prejudice the County and its citizens by creating instability and dislocation in the electoral system and by imposing great financial and logistical burdens. Such a disruption is not justified when there will be no election prior to November 1991, at which time the court-ordered plan may no longer be appropriate because of new census information.

Second, any reapportionment done now would use 1980 census figures, and such reapportionment might not provide fair and accurate representation for the citizens of the County. Therefore, we find that the district court plan would unduly prejudice the County. *See, e.g., MacGovern v. Con-*

*nolly*, 637 F.Supp. 111, 116 (D.Mass.1986) (where court declined to order reapportionment in part because the use of old census figures would "yield results that are at best uncertain and, at worse, perverse"); *Simkins v. Gressette*, 495 F.Supp. 1075, 1082 (D.S.C.1980) (where court noted that the use of ten year old census figures would not "provide fair representation for the people of South Carolina in accordance with the 'one man, one vote' mandate of [*Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) ]" ), *aff'd*, 631 F.2d 287 (4th Cir.1980).[8]

Finally, the principles of equity require a federal court to stay its hand when judicial relief makes no sense. A court-ordered reapportionment at this date would be completely gratuitous, because there are no elections scheduled before November 1991 and the 1990 census figures may require reapportionment.[9] It makes far more sense to await the 1990 census figures and the 1991 reapportionment (if required) than for a court to intervene at such a late hour. If the 1991 reapportionment should violate the Voting Rights Act, the plaintiffs may assert "a new justiciable cause of action." *Maryland Citizens*, 429 F.2d at 611–12.[10]

## III

For the above reasons, we hold that plaintiffs' claims are untimely under the doctrine of laches, and the district court

---

**7.** Prior to the next regularly scheduled Board of Supervisor elections in November 1991, the Board is required, pursuant to Article VII, Section 5 of the Virginia Constitution and to Virginia Code Ann. § 15.1–37.5:1 (1989), to reapportion the election districts using the population figures from the 1990 census.

The 1990 census figures will probably require reapportionment. The 1980 figures initially produced a total population deviation of 14% from the 1970 figures, a deviation that required reapportionment. But after a correction of census error, the total deviation dropped to 10%, which was considered an acceptable level. Since the 1990 figures will probably produce an even greater deviation, reapportionment appears likely.

**8.** Plaintiffs contend that it is unlikely that the County's population has changed significantly

enough to preclude the use of the 1980 census figures. However, we hesitate to risk injustice by relying on plaintiffs' speculative assertion, particularly while the census is in the process of being taken.

**9.** Plaintiffs' complaint requested that the district court order a special Board election to be held under the plan adopted by the court. However, the court declined to order the special election, which plaintiffs do not appeal.

**10.** Plaintiffs contend that they will not have enough time to challenge the 1991 reapportionment before the 1991 elections. However, plaintiffs are not in a position to make such a complaint when it is their tardiness in challenging the 1981 reapportionment that led to their predicament.

abused its discretion in failing to dismiss the case.

REVERSED.