UNITED STATES of America, Plaintiff,

v.

**SMITHFIELD FOODS, INC., Smithfield Packing Company, Inc., and Gwaltney of Smithfield, Ltd., Defendants.**

Action No. 2:96cv1204.

United States District Court,
E.D. Virginia,
Norfolk Division.

July 16, 1997.

Susan Lynn Watt, Asst. U.S. Atty., Norfolk, VA, Lois J. Schiffer, U.S. Dept. of Justice, Washington, DC, Yvette C. Roundtree, Asst. Regional Counsel, U.S. Environmental Protection Agency, Office of Regional Counsel, Philadelphia, PA, Nadine Steinberg, U.S. Environmental Protection Agency, Washington, DC, Sarah D. Himmelhoch, Richard Hong, U.S. Dept. of JusticeEnvironmental, Enforcement Section, Washington, DC, for Plaintiff.

Anthony F. Troy, Mays & Valentine, Richmond, VA, Patrick M. Raher, James T. Banks, John G. Roberts, Jr., Patrick D. Traylor, Hogan & Hartson, L.L.P., Washington, DC, for Defendants.

**OPINION**

REBECCA BEACH SMITH, District Judge.

This matter is before the court on defendants' Motion for Reconsideration and Clarification of this Court's May 30, 1997 Opinion and Order Granting the United States' Motion for Partial Summary Judgment, filed June 13, 1997, and defendants' Motion for Reconsideration of this Court's June 20, 1997 Order Amending the Order on Initial Pretrial Conference, filed June 25, 1997. The government filed a response to the first motion for reconsideration on June 24, 1997, and a response to the second motion for reconsideration on July 2, 1997. Defendants replied late to the government's response to defendants' first motion for reconsideration on June 30, 1997, and filed a Motion for Enlargement of Time. Since the United States will not be prejudiced if defendants are granted such an extension, and defendants have shown good cause, the court GRANTS defendants' Motion for Enlargement of Time, and will consider their reply.

I.  Motion for Reconsideration and Clarification of the Court's May 30, 1997 Opinion

A.  Motion for Reconsideration

■ When considering a motion for reconsideration, the court should not reevaluate the basis upon which it made a prior ruling, if the moving party merely seeks to reargue a previous claim. *Glenn v. Inland Container Corp.*, 1992 WL 521517, at *1 (E.D.Va. May 13, 1992), *aff'd*, 991 F.2d 789 (4th Cir.1993). It is only appropriate for the court to review a previous decision where, for example, it

> has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension. A further basis for a motion to reconsider would be a controlling or significant change in the law or facts since the submission of the issue to the Court. *Such problems rarely arise and the motion to reconsider should be equally rare.*

*Above the Belt, Inc. v. Mel Bohannan Roofing, Inc.*, 99 F.R.D. 99, 101 (E.D.Va.1983)

(emphasis added) (quoted in *Glenn*, 1992 WL 521517, at *1).

Defendants seek to convince this court to reconsider its May 30, 1997 decision by presenting new evidence on factual issues that were not dispositive, and by rearguing the facts and law originally argued in the parties' briefs and at the hearing held on April 14, 1997. The relevant facts and law were fully discussed in the court's May 30, 1997 Opinion, and there is no reason to repeat that factual or legal analysis in full here. However, the court will address some of defendants' arguments and mischaracterizations of the court's holding, the law, and the evidence, set forth in their motion for reconsideration of the court's May 30, 1997 Opinion.[1]

■ Defendants contend that the court should not have granted summary judgment when discovery was ongoing, since defendants complied with Federal Rule of Civil Procedure 56(f) by identifying specific reasons they could not respond to several of the United States' arguments without discovery. Federal Rule of Civil Procedure 56(f) provides:

> Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

To oppose summary judgment under Rule 56(f), the party's Rule 56(f) affidavit must contain "(1) the information sought and how it is to be obtained; (2) how a genuine issue of material fact will be raised by that information; (3) what efforts the affiant has made to obtain the information; and (4) why those efforts were unsuccessful." *Sage Realty Corp. v. Insurance Co. of N. Am.*, 34 F.3d

124, 128 (2nd Cir.1994). "If the additional discovery will not likely generate evidence germane to the summary judgment motion, the district court may, in its discretion, proceed to rule on the motion without further ado." *International Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1267 (5th Cir.1991), *cert. denied*, 502 U.S. 1059, 112 S.Ct. 936, 117 L.Ed.2d 107 (1992). "[T]he court need only concern itself with contradictions of salient facts; factual disputes over issues not germane to the claim are simply irrelevant because they are not outcome determinative. The court may grant a motion, immaterial factual disputes notwithstanding." *Id.* at 1264 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986)).

In their Rule 56 Affidavit, which was attached to the end of their memorandum in opposition to summary judgment, defendants identified three areas for which "[t]here exist facts yet to be discovered and established:" (1) the intent of the Commonwealth of Virginia in negotiating, drafting, interpreting, and enforcing the consent orders, draft permits, and permits; (2) the extent to which the EPA was aware of, reviewed, and approved of the Commonwealth's actions regarding defendants; and (3) the diligence with which the Commonwealth carried out its regulatory, enforcement, and other actions with regard to defendants. Defs.' Rule 56 Aff.

■ This additional discovery identified by defendants was not dispositive to the court's decision granting the United States partial summary judgment. Thus, it was within the court's discretion to proceed to rule on the summary judgment motion, notwithstanding defendants' Rule 56(f) Affidavit, because that Affidavit did not raise a genuine issue of *material* fact.[2] For the following reasons, defendants have not established that the court abused its discretion when it ruled on the United States' motion for partial summary judgment, nor have they provided ade-

---

[1]. For any repetitive arguments of defendants which are not addressed in this Opinion, the court refers defendants to the court's May 30, 1997 Opinion.

[2]. Furthermore, delaying summary judgment in this case would have been incompatible with Congressional intent "to achieve 'swift and direct' enforcement [of the Clean Water Act] based

on 'simple numerical standards.' " *Student Public Interest Research Group of New Jersey, Inc. v. Georgia–Pacific Corp.*, 615 F.Supp. 1419, 1430 (D.N.J.1985) (emphasis added) (citing *Corn Refiners Ass'n, Inc. v. Costle*, 594 F.2d 1223, 1226 (8th Cir.1979) and 44 Fed.Reg. 3263 (June 7, 1979) ("Congress intended that prosecution for permit violations be swift and simple.")). There

quate grounds for the court to reconsider its decision. First, in the court's May 30, 1997 Opinion, the court held that the issue of whether the Commonwealth intended to exempt defendants from the phosphorus limitation and deadline was not dispositive, as the EPA was not bound by the Board's Special Orders and letters. *See* May 30, 1997 Opinion Part II.B.2. & 775 n. 4. Thus, any new evidence on this issue is irrelevant. Second, the court held that defendants never alleged or established there was evidence the EPA expressly reviewed or approved of the Commonwealth's alleged agreement with defendants, and thus the EPA was not bound by that agreement. *See id.* Part II.B.2.[3] The court further held that the EPA's awareness of the Commonwealth's agreement with defendants, along with its silence or inaction, did not constitute "affirmative misconduct" required for estoppel against the United States. *See id.* Part II.C. Third, the court found that the Commonwealth's enforcement scheme was not comparable to Section 309(g) of the Clean Water Act ("Act"), 33 U.S.C. § 1319(g), and thus the court explained it was unnecessary for the court to decide whether the Commonwealth was diligent under Section 309(g)(6)(A) of the Act, 33 U.S.C. § 1319(g)(6)(A). *See id.* Part II.D.

### 1. Commonwealth's intent not dispositive

With regard to the Commonwealth's intent, defendants contend they have uncov-

simply is no legal nor logical requirement that all discovery be completed before a grant of summary judgment, which can occur at any point of the proceedings. Moreover, all discovery in the case has now been completed, and defendants raise no new viable facts upon which this court should reconsider its Opinion of May 30, 1997. *See infra* Parts I.A.1.–3.

**3.** To date, all discovery having been completed, there is no evidence that the EPA *expressly reviewed or approved of the alleged agreement with defendants. See infra* Part II.A.2.a.

**4.** Defendants claim the court incorrectly held that the Commonwealth required defendants to connect to the HRSD system *and* upgrade their facilities in its Special Orders. However, the court never interpreted the Commonwealth's Special Orders as *requiring* defendants to do both. Rather, the court noted that the Commonwealth's intent in its Special Orders was unclear. After considering the evidence before the court, the court only suggested that, in the May, 1991 Special Order, the Commonwealth may have in-

ered "new evidence" during discovery which establishes that the Commonwealth intended to exempt defendants from compliance with the phosphorus limitation and deadline contained in defendants' 1992 Permit, if defendants agreed to connect to the Hampton Roads Sanitation District ("HRSD") system. Although defendants claim this new evidence "conclusively establishes" that the court's May 30, 1997 Opinion was incorrect,[4] the court noted in the Opinion that the issue of whether the Commonwealth intended to provide such an exemption was not dispositive, as the court found that the EPA was not bound by the Board's Special Orders. *See* May 30, 1997 Opinion Part II.B.2. & 775 n. 4. Since this issue of the Commonwealth's intent was not relevant with regard to the court's decision to grant summary judgment, the court was not required to delay its ruling to allow additional discovery on this issue, and the discovery of this "new evidence" of the Commonwealth's intent is not a valid basis for this motion for reconsideration.[5]

### 2. Extent to which EPA was aware of, reviewed, and approved of the Commonwealth's actions

### a. Estoppel defense rejected

With regard to their estoppel defense, defendants contend in their motion for recon-

tended to require compliance for phosphorus as set forth in the Permit (by January 4, 1993), and that it was within defendants' discretion to elect which manner they chose to comply—HRSD connection *or* facility upgrade. *See* May 30, 1997 Opinion at 785–87 & 786 n. 22.

**5.** Furthermore, this "new evidence" referred to by defendants does not change the fact that the May, 1991 Special Order, defendants' October 1, 1991 letter, and the Board's October 10, 1991 letter are unclear with regard to the Commonwealth's intent to relieve defendants from compliance with the phosphorus limitation in the Permit, if they elected to connect to the HRSD system. According to defendants, the 1991 Special Order and letters—and not the other evidence—are what bind the EPA, since the EPA did not object to their contents after receiving a copy of each document. In any event, such contentions are irrelevant to the court's disposition.

sideration that the EPA engaged in affirmative misconduct by reviewing, approving, and providing funding for the HRSD treatment plant upgrade and sewer extension construction when it was aware of the contents of the Board's Special Orders and letters. Defs.' Br. Recons. at 27.[6] The significance of this alleged conduct of the EPA was previously addressed in the court's May 30, 1997 Opinion, which rejected defendants' argument that such conduct by the EPA "incorporated" the Special Orders and letters into the Permit or bound the EPA. *See* May 30, 1997 Opinion Part II.B.2. The court held that even if the EPA stated that the HRSD–Smithfield connection was a "cost effective solution," and reviewed, approved of, and provided funding for the HRSD upgrade and sewer extension, this did not mean that the EPA approved of the alleged agreement in the 1991 Special Order that defendants were exempt from compliance with the phosphorus deadline in the Permit, if they elected to connect to the HRSD system. *Id.* Part II. B.2. at 788. Moreover, since defendants did not allege there was any evidence that the EPA expressly approved of or expressly agreed to be bound by the alleged agreement between the Board and defendants, the court found the EPA did not engage in affirmative misconduct, and rejected defendants' estoppel defense. *Id.* Part II.C.

While defendants' Rule 56(f) Affidavit states that discovery was needed on the extent to which the EPA was aware of, reviewed, and approved of the Commonwealth's actions regarding defendants, defendants base their allegations of affirmative misconduct on the fact that the EPA allegedly reviewed, approved of, and provided funding for the HRSD upgrade and sewer extension when it was aware of the agreement between the Commonwealth and defendants.[7] Even if the EPA knew that the HRSD upgrade and sewer extension were being undertaken to connect defendants to the HRSD treatment facility, and that defendants believed their agreement to connect to the HRSD system relieved them of the obligation to comply in the interim with phosphorus limits, it is absurd to suggest that reviewing, approving of, and providing funding for the HRSD upgrade and sewer extension can be construed as "affirmative misconduct" on behalf of the EPA. Such conduct by the EPA would *reduce* the damage to the environment and *assist* the defendants in complying with their Permit. Since this assistance was clearly not affirmative misconduct, any additional discovery on the extent to which the EPA reviewed, approved of, and provided funding for the HRSD upgrade and sewer extension would have been irrelevant. Accordingly, the court was not required to delay its summary judgment ruling to allow additional dis-

6. This argument was also made by defendants in their brief in opposition to summary judgment. In support of their defense of estoppel, defendants argued that the EPA was aware of the Board's Special Orders and that "[d]iscovery to date demonstrates that the United States acted affirmatively." Defs.' Br. Opp'n Summ. J at 15 (citing the factual section of their opposition brief, ¶¶ 3, 3a, 3b, 9jj, 9kk, 9ll, 9mm, 21, 22, 25, 25a, 25c, 26, 27, 30). These cited paragraphs contain defendants' allegations that: the EPA reviewed, approved of, and funded the HRSD upgrade and sewer extension from HRSD to defendants' plant, *id.* ¶¶ 3, 3a, 3b; the EPA received copies of the Board's and defendants' letters, the Board's Special Orders, draft permits, permits, notices of violation, and defendants' DMRs, *id.* ¶¶ 9jj, 9kk, 9ll, 25a, 26, 27, 30; although it was aware of the agreement between the Board and defendants in the Special Orders that defendants would connect to the HRSD system, the EPA stated that it did not object to the 1991 draft permit or 1992 Permit, and thus defendants claim the EPA agreed to be bound by

the 1991 Special Order since it approved of the 1992 Permit and failed to indicate its disapproval of the HRSD connection, *id.* ¶¶ 9mm, 27; the 1991 Special Order was therefore incorporated into the 1992 Permit by the EPA, *id.* ¶¶ 21, 22, 26; prior to the third quarter of fiscal year 1994, the EPA had information "sufficient to determine Smithfield's discharges and the State's implementation and enforcement posture," *id.* ¶ 25; and therefore, if the EPA "held the view that the 1991 Order does not condition or revise the 1992 Permit," it should have commenced the enforcement action prior to the third quarter of fiscal year 1994. *Id.* ¶ 25c. All of these arguments were addressed and/or rejected by the court in its May 30, 1997 Opinion.

7. As addressed herein, defendants never alleged there was evidence that the EPA *expressly* reviewed and *expressly* approved of the alleged agreement between the Board and defendants exempting defendants from phosphorous compliance, if they agreed to connect to the HRSD system.

covery on this issue. There is no reason for the court to grant defendants' motion for reconsideration based on their defense of estoppel, as there has been no significant change in the law or facts since this issue was submitted to the court.

### b. EPA not bound by awareness of, and failure to object to, the agreement in the 1991 Special Order and letters

Defendants also contend that the court should grant their motion for reconsideration because they claim the evidence already before the court, along with new evidence uncovered during discovery, demonstrates that the EPA was bound by the 1991 Special Order. However, to support their argument, defendants simply repeat factual and legal arguments previously made by defendants and addressed in the court's May 30, 1997 Opinion at Part II.B.2. Since defendants believe the court did not adequately address some of their arguments, the court will address those arguments now.

Defendants contend in their motion for reconsideration that the federal regulations which delegate permitting and enforcement authority to the Commonwealth, and the Memorandum of Understanding ("MOU") between the Commonwealth and the EPA, state that the EPA "can be bound by its silence" with regard to Special Orders and other statements made by the Commonwealth, and therefore earlier Special Orders and letters of the Commonwealth can change

a more recent permit. Defs.' Br. Recons. at 13, 16–18.[8] According to defendants, the 1991 Special Order was "an express condition on the new draft permit under consideration by the EPA." Id. at 15.

Despite their bold assertions, defendants have never cited any law, regulation, or document which legitimately establishes that the EPA can waive its right to enforce the Act, or bind itself to an agreement made between the Commonwealth and a permittee, by failing to object to the contents of a Special Order or letter when a copy of that document is submitted to the EPA. Furthermore, while the MOU may allow the EPA to be "bound by its silence" *with regard to a draft permit or permit submitted to the EPA for approval,* it does not say that the EPA can be so bound for Special Orders and letters sent to the EPA. MOU Part IV. 5–8 (Defs.' Br. Opp'n Summ. J. Ex. 33).[9] *Rather, the MOU says the opposite:* Although the Commonwealth is the primary enforcement authority, and has authority to issue administrative orders, this fact "shall not be construed to limit the authority of the Regional Administrator [of the EPA] to take action pursuant to Section 309 or 504 of the Act." Id. Part V.1. Although defendants claim that Special Orders can limit the authority of the EPA to take action, if the EPA remains silent, nothing in the MOU or the federal law and regulations supports their contention.[10]

Defendants admit that the Commonwealth's phosphorus limitation was incorpo-

---

**8.** For support, defendants cite to their brief in opposition to the summary judgment motion and the transcript of the summary judgment hearing.

**9.** As part of the formulation of the draft permits, the MOU requires the Commonwealth to submit to the EPA "all draft permits, ... including any and all terms, conditions, requirements or documents which *are a part of the proposed permit or which affect the authorization by the proposed permit of the discharge of pollutants."* MOU Part IV.6.a (emphasis added). Once it receives these documents, the EPA must object or waive its right to object. *Id.* Part IV.6.b. Although defendants claim the underlined phrase includes Special Orders, nothing in the federal regulations or the MOU indicates that Special Orders are included in this phrase; rather, Special Orders are mentioned in a different Part of the MOU addressing enforcement of permits by the Commonwealth. *See id.* Part V.1. Only a modifica-

tion of a permit can change the terms of a permit, and defendants admit that the Special Orders and letters at issue were not modifications of defendants' Permit. Defs.' Br. Recons. at 14.

**10.** Under federal law, the only way the United States would be unable to prosecute defendants for their effluent violations would be if: (1) the Permit was modified to reflect defendants' alleged agreement with the Commonwealth, or (2) the Commonwealth was diligently prosecuting an enforcement action under a comparable state law. Defendants admit there was no modification of the Permit, Defs.' Br. Recons. at 14, and the court has already found that Virginia state law was not comparable to Section 309(g), 33 U.S.C. § 1319(g), at the time the Special Orders were issued. *See* May 30, 1997 Opinion Part II.D.

rated into defendants' Permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342, but they claim the Commonwealth in effect removed the phosphorus limitation and deadline from the 1992 Permit in the Commonwealth's 1991 Special Order and October 10, 1991 letter. Nothing in the record supports the contention that the phosphorus limitation and deadline were *legally* removed from the Permit. Defendants concede that the Special Orders and letters did not constitute modifications of the Permit. Defs.' Br. Recons. at 14. Defendants also acknowledge that the permit writer for the Commonwealth's Department of Environmental Quality, Debra Thompson, retained the phosphorus limitation and deadline in the 1992 Permit even after defendants "pointed out her error" in including the phosphorus limitation and deadline in the 1991 draft Permit. *Id.* at 15. Rather than correct her "error" in the 1992 Permit submitted to the EPA for review and approval, Ms. Thompson instead drafted the October 10, 1991 letter which states that the Special Orders took precedence over the Permit—a letter the EPA was not required to review, approve, or accept. If Ms. Thompson had truly erred under the law and regulations governing. permits when she retained the phosphorus limitation and deadline in the 1992 Permit after the agreement in the 1991 Special Order, as defendants suggest, she should have, and could have, changed the terms of the 1992 Permit submitted to the EPA for approval. She did not do so, and the phosphorus limitation and deadline remained part of the 1992 Permit.[11]

Since defendants admit that the EPA has the authority under Section 309(a)(1) and (3) of the Act, 33 U.S.C. § 1319(a)(1) and (3), to enforce a more stringent state effluent standard incorporated into a permit approved by the EPA, Defs.' Br. Opp'n Summ. J. at 29, and the court has found the phosphorus limitation and deadline were not legally removed from the Permit since there was no permit modification, the EPA had authority to enforce the phosphorus limitation and deadline in the 1992 Permit. Notwithstanding the fact that the Commonwealth may have settled its enforcement action with regard to defendants' discharge of phosphorus in a manner that was binding on the Commonwealth, as set forth in the Special Orders and letters, the MOU explains that the Commonwealth's enforcement authority "shall not be construed to limit the authority of the Regional Administrator [of the EPA] to take action pursuant to Section 309 or 504 of the [Clean Water] Act." MOU Part V.1.[12]

In their motion for reconsideration, defendants also mischaracterize and distort a Memorandum, dated December 23, 1991, in which the Executive Director of the EPA approved of the 1992 Permit.[13] Defendants claim that the Memorandum

mentions effluent limitations for a list of pollutants—TSS [sic], oil & grease, cyanide, CBOD and ammonia—but mentions phosphorus only in one place: a clear reference on the first page to Smithfield's

---

11. *See supra* note 10.

12. Contrary to defendants' contention in the portion of their brief discussing Section 510 of the Act, Defs.' Reply Br. Recons. at 19, when the federal government enforces a stricter state standard in a permit, but the state declines to do so, this is not *"preclud[ing] or deny[ing]"* the right of the Commonwealth "to adopt or enforce [its own state standards, limitations, or requirements.]" 33 U.S.C. § 1370. Nothing in the law says that the federal government is prohibited from enforcing a stricter state standard once it is incorporated into a permit just because the state is not similarly enforcing that state standard at the time.

13. This document is a Memorandum from the Permits Program Manager of the State Water Control Board, Martin G. Ferguson, Jr., to the

Executive Director of the EPA, dated December 23, 1991, recommending approval of the limitations and requirements for defendants' 1992 Permit and reissuance of the Permit. The recommendations in the Memorandum were approved by the Executive Director of the EPA on January 3, 1992. *See* Dec. 23, 1991 Memorandum at 4 (Defs.' Br. Opp'n Summ. J. Ex. 23 at 4). The Commonwealth sent the 1992 Permit and this Memorandum to defendants on January 3, 1992, with a letter stating that "[t]he Executive Director has approved the enclosed effluent limitations and monitoring requirements for [VPDES Permit No. VA0059005]. This approval is in accordance with the enclosed memorandum." Jan. 3, 1992 Letter from Commonwealth to Smithfield at 1 (Defs.' Br. Opp'n Summ. J. Ex. 28 at 1).

commitment, pursuant to the 1991 Order, to connect to the HRSD system "when the sewer has been extended to their plant." Consequently, the statement in this same memorandum that Smithfield's discharge was "expected to meet the required effluent limitations," Op. at 53, can only mean that, with respect to phosphorus, this would be accomplished after construction of the sewer and not according to any specific deadline.

Defs.' Br. Recons. at 18 (citing Dec. 23, 1991 Memorandum Accompanying Draft Permit (Defs.' Br. Opp'n Summ. J. Ex. 23)).

The mischaracterization and distortion of this Memorandum is frustrating to the court. Quotes are being taken out of context, and it appears that words are being conveniently deleted or added for purposes of argument. First, there is no such quote of "when the sewer has been extended to their plant" on the first page of the Memorandum; that quote appears on the second page under the section entitled, "*Previous Board Action.*" Dec. 23, 1991 Memorandum at 2. Second, although this section of the Memorandum, "*Previous Board Action,*" refers to the Board's March 25, 1991 meeting, at which defendants agreed to the issuance of the May 9, 1991 Special Order, *see* May 9, 1991 Special Order at 3 (signed by Robert W. Manley, Vice President of Smithfield Foods, Inc., on March 25, 1991), the December 23, 1991 Memorandum quoted by defendants does not otherwise reference the 1991 Special Order anywhere in the Memorandum. "[P]ursuant to the 1991 Order" are defendants' inserted words, not those approved by the Executive Director of the EPA. The section entitled "*Previous Board Action*" states in its entirety:

> In its March 25, 1991 meeting, the Board approved an amendment to an existing Consent Order. The revised Order required the Company to study the available technologies and costs involved in attaining compliance with the phosphorus standard, and the feasibility of connecting to the Hampton Roads Sanitation District

(HRSD). By letter dated June 7, 1991, the Company notified the Board that it will eliminate its wastewater discharges to the Pagan River and connect its facilities to the HRSD system when the sewer has been extended to their plant.

Dec. 23, 1991 Memorandum at 2. This is the only place phosphorous is ever referred to in the entire Memorandum, and there is no mention whatsoever in this section or elsewhere in the Memorandum of changing or waiving compliance with the phosphorus limitation and deadline in the Permit until the HRSD connection is available.

Moreover, the quote referenced by defendants in their brief, "expected to meet the required effluent limitations," is in totality: "This discharge is not controversial and is expected to meet the required final effluent limitations." *Id.* at 4. This statement appears on the last page of the Memorandum at the conclusion of an entirely different section entitled "*Staff Comments,*" which section details permit changes for all of the other effluents, *except phosphorous.* This section, "*Staff Comments,*" begins as follows: "This facility's VPDES Permit was previously reissued on May 13, 1986, was modified on January 4, 1990 and expired on May 13, 1991." *Id.* at 3. Then, the "*Staff Comments*" section continues to detail "changes from the previously issued permit" for all effluents, *except phosphorous. Id.*[14] The "*Staff Comments*" section concludes in regard to these permit changes that "this discharge is not controversial and is expected to meet the required final effluent limitations." *Id.* at 4. There is no mention of phosphorous in this section entitled "*Staff Comments*" which contains the language that defendants argue "can only mean that, with respect to phosphorous, this would be accomplished after construction of the sewer and not according to any specific deadline." Defs.' Br. Recons. at 18. As noted previously, the only mention of phosphorous is under the section entitled "*Previous Board Action,*" which does reference the connection to the HRSD system, but does not change or waive compliance

---

14. There is no mention whatsoever of the 1991 Special Order in this section, or of the alleged agreement between the Commonwealth and de-fendants that the latter were exempt from the phosphorus limitation and deadline, since they agreed to connect to the HRSD system.

with the phosphorus permit standard until the connection is completed.

It is inconceivable to this court how defendants can legitimately argue that the statement "expected to meet the required final effluent limitations" refers to the alleged agreement in the 1991 Special Order, since there was no direct mention of the 1991 Special Order in the December 23, 1991 Memorandum; or how they can seriously contend that this statement means the phosphorous limitation and deadline in the Permit were changed or waived, when this statement appears in a section of the Memorandum following approved changes for other effluents, *but which makes no mention of phosphorous.* Defendants' assertion in this regard is factually unsupported by the record and is a totally misleading argument presented to this court. Thus, defendants have failed to point to any evidence which suggests that the EPA expressly approved of the alleged agreement in the 1991 Special Order between the Commonwealth and defendants to change or waive the phosphorous limitation and deadline in the 1992 Permit, if defendants elected to connect to the HRSD system, with no deadline for compliance.[15]

### 3. Section 309(g)(6)(A) of the Act

The court was also not required to delay its summary judgment ruling to allow additional discovery on the issue of the diligence with which the Commonwealth carried out its regulatory, enforcement, and other actions with regard to defendants. The court rejected defendants' claim that the United States' action was precluded under Section 309(g)(6)(A) of the Act, 33 U.S.C. § 1319(g)(6)(A), based on the fact that the Commonwealth's enforcement scheme was not comparable to 33 U.S.C. § 1319(g) at the time the Special Orders were issued. *See* May 30, 1997 Opinion Part II.D. In light of this holding, it was unnecessary for the court to decide the issue of whether the Common-

wealth was diligent, and therefore additional discovery on this issue was irrelevant to the court's decision granting summary judgment.

In their motion for reconsideration, defendants also reargue their position that the Commonwealth's enforcement scheme was comparable. Defs.' Br. Recons. at 20–25. This issue was fully discussed in Part II.D. of the court's May 30, 1997 Opinion. The court will not repeat its analysis here since defendants do not point to any significant change in the law or facts since the issue was submitted to the court.

■ In conclusion, defendants have failed to convince this court to reconsider its May 30, 1997 Opinion. Although defendants claim they have uncovered new evidence to support their case during discovery, the evidence is only applicable to factual issues that were not dispositive. Defendants are simply rearguing their previous claims in this motion, and they have failed to set forth any controlling or significant change in the law or facts since the issue was submitted to the court. Accordingly, the court DENIES defendants' motion for reconsideration of the court's May 30, 1997 Opinion, as they have failed to present any legitimate basis in fact or law for reconsideration.

### B. Clarification of Available Defenses

Since the United States did not move for summary judgment on three of defendants' affirmative defenses, "including (1) selective enforcement; (2) laches; and (3) that Smithfield could not be held liable for the wrongful conduct of Mr. Terry Rettig, a rogue employee of Smithfield," Defs.' Br. Recons. at 28, defendants request that the court clarify whether defendants are precluded from presenting these defenses at trial.

### 1. Selective enforcement

■ Defendants ask the court whether they are precluded from raising a selective

---

15. The court recognizes the fact that the EPA did not oppose, and even assisted with, the HRSD connection that eventually will eliminate defendants' discharge of phosphorus and other effluents. But the EPA never adopted the 1991 Special Order, nor modified the 1992 Permit, thereby agreeing to waive compliance until the

connection occurred. Future compliance at some unknown date does not alleviate the need for current compliance, absent a permit modification or express agreement by the EPA. May 30, 1997 Opinion at 783 n. 19. This court will not revisit this issue.

enforcement defense at trial. The simple answer is "yes." First, defendants never properly raised this defense. Federal Rule of Civil Procedure 8(b) requires defendants to "state in short and plain terms" any defenses in their Answer. Defendants did not specifically cite a defense of "selective enforcement" in their Answer. The only defense which might be construed as a selective enforcement defense is their Seventh Defense, which states: "Plaintiff's claims are barred by considerations of public policy and the United States Constitution because plaintiff is prosecuting this action for impermissible reasons." Answer at 14. Second, to the extent that this statement sets forth any "defense" of "selective enforcement," such defense was implicitly rejected by the May 30, 1997 Opinion. However, to the extent that the analysis in the court's Opinion did not address this "defense," the court will do so now.

According to the Supreme Court of the United States, the federal government has "broad discretion" to enforce the laws of this Nation. *United States v. Armstrong,* — U.S. —, —, 116 S.Ct. 1480, 1486, 134 L.Ed.2d 687 (1996) (citing *Wayte v. United States,* 470 U.S. 598, 607, 105 S.Ct. 1524, 1530, 84 L.Ed.2d 547 (1985)). A " 'presumption of regularity supports' [the United States'] prosecutorial decisions and 'in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties.' " *Id.* (citing *United States v. Chemical Foundation, Inc.,* 272 U.S. 1, 14–15, 47 S.Ct. 1, 6, 71 L.Ed. 131 (1926)). However, the United States' discretion is clearly subject to constitutional constraints, such as the Equal Protection Clause of the Constitution, which ensures that any decision to prosecute a particular person is not based on unjustifiable standards, such as race, religion, or other arbitrary classifications. *Id.*

The requirements for a defense of selective prosecution are similar to the standards for a violation of equal protection. *Id.* at —, 116 S.Ct. at 1487 (citing *Wayte,* 470 U.S. at 608, 105 S.Ct. at 1531). To prove a prima facie case of selective prosecution, "[t]he claimant must demonstrate that federal prosecutorial policy 'had a discriminatory effect and that it was motivated by a discriminatory purpose.' " *Id.* (quoting *Wayte,* 470 U.S. at 608, 105 S.Ct. at 1531). One court explained this standard in more detail in the context of an environmental violation case: "defendants bear a heavy burden of establishing that (1) defendants have been singled out while other similarly situated violators were left untouched, and (2) that the government selected defendants for prosecution 'invidious[ly] or in bad faith, i.e., based upon such impermissible considerations as race, religion, or the desire to prevent the exercise of [their] constitutional rights.' " *United States v. Production Plated Plastics, Inc.,* 742 F.Supp. 956, 962 (W.D.Mich.), *opinion adopted by,* 955 F.2d 45 (6th Cir.), *cert. denied,* 506 U.S. 820, 113 S.Ct. 67, 121 L.Ed.2d 34 (1992) (citing *United States v. Bustamante,* 805 F.2d 201, 202 (6th Cir.1986) and *United States v. Hazel,* 696 F.2d 473, 474 (6th Cir.1983)).

In light of the wide discretion afforded the United States in exercising its prosecution powers, the court finds defendants did not raise a genuine issue of material fact with regard to any defense of selective enforcement. Defendants have not put forth any evidence suggesting that the EPA has failed to pursue enforcement actions against similarly situated violators, nor have they offered any evidence of governmental vindictiveness or intentional discrimination for improper purposes.[16] There is no evidence that the government chose to prosecute defendants based on an arbitrary or otherwise impermissible classification. Consequently, the court HOLDS that defendants' selective enforcement defense is not available as an affirmative defense for the remaining counts at trial, or for the counts upon which summary judgment already issued.

*2. Laches*

The defense of laches was also applicable to the United States' motion for partial sum-

---

16. In fact, the court has already found that there is no evidence of affirmative misconduct by the government. *See* May 30, 1997 Opinion Part II.C.

mary judgment. Since the court granted that motion, the court also rejected any laches defense by implication in its May 30, 1997 Opinion. To the extent that the analysis in the court's Opinion did not address the defense of laches, the court will do so now.

■■■■ Although laches is one of the affirmative defenses generally available under Federal Rule of Civil Procedure 8(c), "it is properly relevant only where the claims presented may be characterized as equitable, rather than legal." *White v. Daniel,* 909 F.2d 99, 102 (4th Cir.1990), *cert. denied,* 501 U.S. 1260, 111 S.Ct. 2916, 115 L.Ed.2d 1079 (1991) (citing *Environmental Defense Fund, Inc. v. Alexander,* 614 F.2d 474, 478 (5th Cir.), *cert. denied,* 449 U.S. 919, 101 S.Ct. 316, 66 L.Ed.2d 146 (1980)). To bar an action based on the defense of laches, the defendant has the burden of showing both: "(1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense." *Costello v. United States,* 365 U.S. 265, 282, 81 S.Ct. 534, 543, 5 L.Ed.2d 551 (1961); *White,* 909 F.2d at 102. To prove lack of diligence, the defendant must establish inexcusable or unreasonable delay by the plaintiff in filing suit after the plaintiff discovers, or with reasonable diligence could have discovered, the facts which gave rise to the cause of action. *White,* 909 F.2d at 102. The second element, prejudice to the defendant, may be established by proving some "disadvantage on the part of the defendant in asserting or establishing a claimed right or some other harm caused by detrimental reliance on the plaintiff's conduct." *Id.* The court's determination of whether the laches defense applies will only be reversed for a clear abuse of discretion. *Id.*

■■■ "The doctrine of laches is applicable to environmental causes of action." *Mullin v. Skinner,* 756 F.Supp. 904, 915–16 (E.D.N.C.1990) (citing *Ecology Center of Louisiana, Inc. v. Coleman,* 515 F.2d 860,

867 (5th Cir.1975)). In *Mullin,* an environmental violation case, the defendant claimed laches as a defense since the plaintiffs delayed bringing the action to enjoin a bridge-replacement project. Despite the delay, the court rejected a laches defense because it found the delay was excusable and defendants were not prejudiced, even though defendants had completed the design of the bridge at a cost of approximately $350,000, acquired the right-of-way at a cost of $826,-000, and spent money to advertise the construction contract. In denying laches, the court noted that " '[l]aches must be invoked sparingly in environmental cases because ordinarily the plaintiff will not be the only victim of alleged environmental damage. A less grudging application of the doctrine might defeat Congress's environmental policy.' " *Id.* (quoting *Preservation Coalition, Inc. v. Pierce,* 667 F.2d 851, 854 (9th Cir. 1982)).

■■■ The United States filed this action initially seeking permanent injunctive relief and civil penalties from defendants for various violations of the Act. However, defendants are now almost fully connected to the HRSD system,[17] and will soon stop discharging effluents into the Pagan River. Thus, under *White,* 909 F.2d at 102, the laches defense is no longer "relevant" because the United States' claims are now primarily legal, rather than equitable.

■■■ Even if the laches defense was still relevant, however, it is clear defendants could not use it to bar this action. The EPA did not file suit until December 16, 1996, but there is no evidence that this "delay" was either inexcusable or unreasonable. Lorraine H. Reynolds, an Environmental Scientist with the EPA, explained that the EPA did not discover defendants' violations of their Permit until the third quarter of the 1994 fiscal year. Decl. of Reynolds ¶ 12. Thereafter, the EPA tracked the Commonwealth's attempts to get defendants into com-

17. Defendants noted in their Answer that the HRSD–Smithfield connection would be completed, and discharge into the Pagan River would be eliminated, around March, 1997. Answer ¶¶ 3, 18, 25. In their brief in opposition to the United States' motion for summary judgement, defen-

dants stated that the HRSD connection would be completed around May, 1997. Defs.' Br. Opp'n Summ. J. at i ¶ 3, × ¶ 9ii, 3. However, it remains unclear whether even to date the connection is complete.

pliance, *id.* ¶ 14, and eventually filed its own enforcement action "[w]hen it became apparent that the Commonwealth's actions were not resulting in compliance." *Id.* Defendants, on the other hand, claim the EPA knew of the violations prior to the third quarter of fiscal year 1994, and had information "sufficient to determine Smithfield's discharges and the State's implementation and enforcement posture." Defs.' Br. Opp'n Summ. J. ¶ 25. Even if the EPA was aware of this information prior to the third quarter of fiscal year 1994, defendants have not convinced the court that it was inexcusable or unreasonable for the EPA to delay in filing suit, especially when the EPA was waiting to see if the Commonwealth's enforcement action would result in defendants' timely compliance with the Permit.[18]

Furthermore, defendants have not convinced the court that they relied to their detriment on any delay of the United States. This case is different than a case like *Mullin,* 756 F.Supp. 904, where the defendants invested a considerably large amount of money in a bridge-replacement project which would be lost if the court enjoined the construction of the project. In the case at hand, if the defense of laches is rejected, the money spent by defendants on the HRSD connection will not be wasted, as defendants are required to comply with the Permit, and the investment will help them achieve compliance in the future. The fact that defendants may have to pay civil penalties for past violations, in addition to the money spent to connect to the HRSD system and maintain the connection, does not constitute detrimental reliance to their prejudice. As discussed in the May 30, 1997 Opinion, and herein, future compliance does not excuse liability for past violations.[19] Regardless of whether and when the United States filed suit, defendants would have been required to spend money to achieve compliance with their Permit, either by upgrading their facility or connecting to the HRSD system. Thus, any delay by the United States in filing suit for past violations did not prejudice defendants.

There is no evidence the United States' delay in filing suit was inexcusable or unreasonable, and defendants have not sufficiently established detrimental reliance to their prejudice. Accordingly, the court HOLDS that the defense of laches is not a defense available to defendants at trial, or on the counts upon which summary judgment has been granted.

*3. Mr. Rettig*

Defendants' Eighth Defense in their Answer is that they cannot be held liable for the unauthorized and allegedly unlawful conduct of Mr. Rettig. Although the United States did not ask for summary judgment on this issue in its first motion for partial summary judgment, it has done so in its Motion for Partial Summary Judgment on Defendants' Liability for False Reporting and Records Destruction, filed on June 25, 1997. This motion is currently under consideration by the court. Therefore, this defense remains available for use by defendants at trial at this juncture.

*II. Motion for Reconsideration of the Court's June 20, 1997 Order*

Finally, in response to defendants' motion for reconsideration of the court's June 20, 1997 Order, which amended the Order on Initial Pretrial Conference, the court FINDS that the parties may introduce evidence at trial relating to the factors set forth in Section 309(d) of the Act, 33 U.S.C. § 1319(d).

It is so ORDERED.

---

**18.** To date, there still appears to be no viable, ongoing enforcement suit against defendants by the Commonwealth for defendants' violations.

**19.** *See supra* note 15.